ORDERED.

Dated:  **August 23, 2022**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 8:19-bk-04251-MGW
                                                          Chapter 7
Alexander Jose Fernandez,

      Debtor.

_____/

Alexander Jose Fernandez,                                 Adv. No. 8:19-ap-00396-MGW

      Plaintiff,

v.

Internal Revenue Service,

      Defendant.

_____/

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Under Bankruptcy Code § 523(a)(1)(C), a debtor cannot discharge a tax debt that he "willfully attempted in any manner to evade or defeat." Here, the Debtor seeks to discharge hundreds of thousands of dollars in unpaid taxes. The United States contends that the Debtor's failure to pay taxes was willful because rather than

pay his taxes, the Debtor spent substantial sums on a house in an exclusive

neighborhood, luxury cars, designer goods, international trips, and an expensive

engagement ring. This Court must decide whether the United States has met its

burden of proving that the Debtor's high discretionary spending, coupled with his

failure to timely file his tax returns, constitutes a willful attempt to evade his tax debt

under Bankruptcy Code § 523(a)(1)(C), thereby rendering his tax debt

nondischargeable.

While excessive spending is circumstantial evidence of willfulness, whether

the Debtor acted willfully must be determined from the totality of the circumstances.

Here, the evidence at trial showed that the Debtor's spending was high, but it was

not necessarily excessive or lavish. What's more, the evidence at trial showed that

the Debtor's initial failure to pay his taxes was the result of a mistake; the Debtor

dealt with the IRS in good faith; and the Debtor did not attempt to conceal assets.

Given the totality of the circumstances, the Court concludes that the United States

failed to prove by a preponderance of the evidence that the Debtor's failure to pay his

taxes was willful. The Debtor's tax debt is therefore dischargeable.

## I.    Findings of Fact

The Debtor is a radiologist. He earned his medical degree from the University

of Michigan Medical School more than two decades ago.[1] After finishing medical

school, the Debtor did an internship, followed by his residency and then a

---

[1] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 3; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 132, ll. 21 – 23.

fellowship.[2] In 2008, following his fellowship, the Debtor began working in private practice.

### A.  From 2008 to 2015, the Debtor earned substantial income as a radiologist.

The Debtor's first job in private practice was with Imaging Consultants of South Florida, where he worked for five months until the practice was sold.[3] In September 2008, the Debtor joined Optimal Radiology.[4] The Debtor worked there for almost seven years.[5] During his seven years with Optimal Radiology, the Debtor earned an average of $400,000 per year. Most years, his earnings were north of $400,000.[6] He made the most money in 2013, when he made a little less than $500,000.[7]

### B.  The Debtor got into problems with the IRS because he didn't know he had to make estimated tax payments.

When the Debtor was a medical resident and a fellow, he worked as a W-2 employee.[8] In fact, before entering private practice in 2008, every job the Debtor had

---

[2] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 132, l. 24 – p. 133, l. 1.

[3] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 12.

[4] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 13.

[5] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 13.

[6] Joint Ex. 38, Adv. Doc. No. 34-16, p. 32, l. 21 – p. 33, l. 3.

[7] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 28, l. 23 – p. 29, l. 10; p. 31, ll. 13 – 18; p. 138, l. 24 – p. 139, l. 18.

[8] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 133, ll. 5 – 16.

was as a W-2 employee.[9] As a W-2 employee, the Debtor's employers withheld taxes from his paycheck.[10]

It wasn't until the Debtor completed his fellowship and took a job with a radiology practice that he was employed as a "1099" independent contractor for the first time.[11] As an independent contractor, the Debtor was responsible for his own business expenses: office rent, licensing and certification fees, malpractice insurance, etc.[12] More important, he was also responsible for making estimated tax payments.[13]

When the Debtor took his first 1099 position, however, he wasn't aware of the need to make estimated tax payments.[14] Nor was he prepared for the increase in his tax rate when he went from his fellowship to private practice.[15] The Debtor didn't discover the need to make estimated tax payments until October 2010, when he went

---

[9] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 32, l. 1 – p. 33, l. 11; Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 20.

[10] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 134, ll. 11 – 20.

[11] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 133, ll. 17 – 24. Technically, the Debtor took a faculty position after completing his fellowship, and that position was a "1099" independent contractor position. *Id.* But that position only lasted "a little while" while the Debtor waited for his new job at Imaging Consultants of South Florida to become ready. *Id.*; Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 12.

[12] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 29, l. 1 – p. 30, l. 8; Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 17.

[13] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 134, ll. 11 – 20.

[14] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 32, l. 1 – p. 33, l. 11; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 135, l. 10 – p. 136, l. 1.

[15] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 21.

to a tax preparer (who worked for tax attorney Darren Mish) for help with his 2009 tax return.[16]

Because the Debtor had not been making estimated tax payments for 2009 and 2010, the tax preparer advised the Debtor, who up to that point had not owed any unpaid taxes, that he was going to incur a significant tax liability for 2009 and a similar liability for 2010.[17] When the Debtor belatedly filed his tax returns for those years, he ended up owing $57,019 for 2009 and $104,195 for 2010.[18]

### C.    The Debtor enters into an installment agreement with the IRS.

When the Debtor learned he was going to owe substantial past-due taxes to the IRS, he asked Mish for help.[19] An associate at Mish's office told the Debtor not to do anything until the IRS sent him a bill, at which point the associate would tell the Debtor how to proceed.[20] Mish's office advised the Debtor to begin making estimated tax payments in the meantime.[21]

---

[16] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 32, l. 1 – p. 33, l. 11.

[17] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 32, l. 1 – p. 33, l. 11; p. 136, l. 2 – p. 137, l. 3; Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 19.

[18] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 4 & 5. It is unclear whether the Debtor received an extension for 2009 or 2010, but even if he did, his returns were still late: he filed his 2009 tax return on October 21, 2010 and his 2010 tax return on December 22, 2011. *Id.*

[19] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 136, l. 18 – p. 137, l. 3.

[20] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 137, ll. 4 – 16.

[21] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 24.

So the Debtor made $14,462 in estimated payments at the end of 2010; then, in 2011, the Debtor made $53,126 in estimated tax payments[22]. Although it's not clear if or when the IRS sent the Debtor a bill, the Debtor says Mish's office instructed him sometime in 2012 to stop making payments to the IRS (presumably on past-due taxes) until Mish worked out an installment agreement.[23] By August 2012, however, no installment agreement had been worked out.[24]

At that point, the Debtor reached out to the IRS directly.[25] As part of his negotiations with the IRS, the Debtor offered to pay $3,000 per month, which the IRS accepted.[26] And for two years, the Debtor paid the IRS $3,000 per month under the installment agreement.[27]

### D. The Debtor defaulted on his installment agreement when he became entangled in a costly divorce.

Around the time the Debtor entered into his installment agreement with the IRS, his wife, Intissar, filed for divorce.[28] The divorce was costly. Of course, there

---

[22] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 24.

[23] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 25.

[24] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 26.

[25] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 26; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 137, l. 17 – p. 138, l. 17.

[26] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 137, l. 17 – p. 138, l. 17.

[27] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 27 & 30; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 138, l. 18 – p. 139, l. 2.

[28] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 28.

were legal fees—both his own and Intissar's.[29] On top of that, the Debtor had to pay the household expenses for Intissar, who had custody of the couple's two children.[30] Because child support and alimony were based on the Debtor's recent income, and 2013 was the Debtor's highest grossing year, at one point the Debtor was obligated to pay as much as $13,000 per month in domestic support obligations ($10,000 in alimony and $3,000 in child support).[31]

Making matters worse, at the same time the Debtor became entangled in a costly divorce, his income had taken a hit. In fact, it appears the Debtor's income was basically cut in half from 2013 to 2014.[32] The decrease in income, coupled with the costly divorce, caused the Debtor to default on his installment agreement in 2014.[33]

### E.    In the meantime, the Debtor's tax problems were getting worse.

Although the Debtor entered into the installment agreement in 2012 and made payments on it in 2013 and parts of 2014, the Debtor was actually falling further behind on his tax obligations because he still was not paying enough in estimated

---

[29] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 28.

[30] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 28.

[31] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 139, l. 3 – p. 140, l. 24.

[32] Joint Exs. 5 & 6, Adv. Doc. No. 33-5 & 33-6. In a sworn statement, the Debtor testified that in 2014, his income decreased by roughly 55% from prior years. Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 29 & 30. At trial, the Debtor described the decrease as being closer to 25%. Trial Tr. Vol. I, Adv. Doc. No. 41, p. 139, l. 3 – p. 140, l. 18. According to the Debtor's IRS account transcripts, his adjusted gross income dropped from $396,298 in 2013 to $204,049 in 2014—a 49% decrease. Joint Exs. 5 & 6, Adv. Doc. No. 33-5 & 33-6.

[33] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 30.

taxes.[34] According to his 2013 and 2014 tax returns, both of which (like his 2009, 2010, and 2011 tax returns) were filed late, the Debtor ended up owing $125,443 for 2013 and $54,570 for 2014.[35]

### F.    The IRS rejects the Debtor's offer in compromise.

In June 2015, the Debtor once again retained Mish to deal with his tax debt.[36] According to the Debtor, Mish recommended that he pursue an "offer in compromise."[37] Mish apparently recommended that the Debtor, whose tax debt at that point totaled in the hundreds of thousands of dollars, make an offer of $10,000.[38] Mish told the Debtor $10,000 should be enough to get his foot in the door with the IRS, at which point they could begin negotiating with an IRS Revenue Officer.[39]

To file the offer of compromise on the Debtor's behalf, Mish requested that the Debtor fill out certain required forms and provide to Mish certain financial documents.[40] The Debtor insists that he submitted all the required forms and

---

[34] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 34, l. 20 – p. 35, l. 5.

[35] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 8 & 9.

[36] Joint Ex. 31, Adv. Doc. No. 34-10.

[37] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 85, l. 21 – p. 86, l. 2; Joint Ex. 31, Adv. Doc. No. 34-10.

[38] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 150, ll. 7 – 17.

[39] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 150, ll. 7 – 17.

[40] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 87, l. 1 – p. 88, l. 17.

documents to Mish by July or August 2015.[41] The Debtor, assuming that Mish had

submitted the $10,000 offer in compromise not long after the Debtor had provided

him the requested documents, did not hear from Mish until sometime in 2017, which

did not surprise the Debtor because Mish had told him the offer-in-compromise

process could take more than a year.[42]

In actuality, the offer in compromise was not submitted until May 2017.[43] It

turns out Mish did not have all the information he needed to submit the offer.[44] In

December 2016, Mish's office sent a letter to the Debtor seeking more information,

but the Debtor was no longer living at the address where Mish sent the letter.[45]

Eventually, Mish got in touch with the Debtor and got the information he needed, at

which point Mish submitted a $10,000 offer in compromise on the Debtor's behalf.[46]

The IRS rejected the offer, however, because it was less than the Debtor's "reasonable

collection potential" and because the IRS had determined, based on the information

the Debtor had submitted, that he could pay his past-due taxes in full.[47]

---

[41] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 87, l. 1 – p. 88, l. 17.

[42] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 87, l. 1 – p. 89, l. 16; p. 147, l. 13 – p. 150, l. 6.

[43] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 111, l. 23 – p. 112, l. 1; Joint Ex. 29, Adv. Doc. No. 34-8.

[44] Joint Ex. 28, Adv. Doc. No. 34-7.

[45] Joint Ex. 28, Adv. Doc. No. 34-7; Joint Ex. 12, Adv. Doc. No. 33-12.

[46] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 149, l. 2 – p. 150, l. 10.

[47] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 112, ll. 12 – 14; p. 127, l. 24 – p. 128, l. 11; p. 150, l. 18 – p. 151, l. 1; Joint Ex. 29, Adv. Doc. No. 34-8.

### G.    The Debtor's appeal of the denial of his offer in compromise was unsuccessful.

Mish advised the Debtor that it was common for the IRS to reject an offer in compromise.[48] Mish also told him it was common for offers in compromise to be worked out on appeal.[49] So, based on Mish's advice, the Debtor appealed the IRS's rejection.[50]

During the appeal, the Debtor increased his offer of compromise from $10,000 to $20,000.[51] But there was a problem: to pursue the appeal, the Debtor needed to be current on his tax obligations[52]—and he wasn't.

In 2015 and 2016, when he thought the offer in compromise had been submitted, the Debtor says he was more or less current with his tax obligations.[53] During those years, the Debtor was making estimated tax payments, leaving him with a small balance—$6,000 or $7,000—that he could pay at the end of the year.[54]

But things changed in 2017. For one thing, one of the places the Debtor was providing services to had significant financial difficulties, so they were having trouble

---

[48] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 150, l. 18 – p. 151, l. 11.

[49] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 150, l. 18 – p. 151, l. 11.

[50] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 151, ll. 12 – 14.

[51] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 96, ll. 4 – 11.

[52] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 110, ll. 18 – 21.

[53] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 94, l. 15 – p. 95, l. 22.

[54] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 94, l. 15 – p. 95, l. 22.

paying the Debtor.[55] For another, Hurricane Irma hit the Florida panhandle, where many of the facilities the Debtor serviced were located.[56] Because Hurricane Irma affected many of those facilities, as well as the power to the areas where the facilities were located, the Debtor's revenue (and income) therefore decreased.[57] As a result, the Debtor was roughly $40,000 to $50,000 behind on his 2017 taxes.[58]

According to the Debtor, the IRS gave him 48 hours to come up with the $40,000 to $50,000.[59] Although the Debtor was able to raise half that amount by borrowing from family members, he could not come up with the full $40,000 – $50,000 within 48 hours.[60] Because the Debtor was unable to bring his 2017 taxes current, the IRS was unable to process his appeal. So the IRS returned the Debtor's appeal to him.

### H. During the time the Debtor failed to pay his taxes, he spent substantial sums on housing, cars, food, travel, and personal items.

In each year from 2009 through 2014, the Debtor owed unpaid taxes at the end of the year.[61] According to his tax returns for 2009 – 2014, the Debtor owed

---

[55] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 94, l. 15 – p. 95, l. 22.

[56] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 151, l. 12 – p. 152, l. 21.

[57] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 151, l. 12 – p. 152, l. 21.

[58] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 154, ll. 6 – 8.

[59] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 154, ll. 6 – 8.

[60] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 155, ll. 1 – 8.

[61] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 4 – 10.

$57,019 for 2009; $104,195 for 2010; $96,436 for 2011; $92,577 for 2012; $125,443 for 2013; and $54,570 for 2014.[62] Not including penalties or interest, the Debtor owed $530,240 in unpaid taxes from 2009 to 2014.[63] Over that same period of time, the Debtor spent substantial sums on housing, cars, food, travel, and personal items.

### 1.    The Debtor lived in (increasingly) expensive houses.

Between October 2009 and April 2012, the Debtor lived in a condo he rented for $2,000 per month.[64] But in 2012, a year after realizing he had incurred significant tax liability for 2009,[65] the Debtor moved into a condominium on East Cumberland Avenue in Tampa, Florida that cost $2,500 per month to rent (not including $1,000 per month for utilities).[66] Then, in September 2014, the Debtor moved into a house on South Elberon Street in Tampa with his soon-to-be second wife, Sarah.[67] That house cost $3,000 per month, though Sarah helped with the payments.[68] Since then, the Debtor has moved twice (once to a house on West Sylvan Ramble Street and then to a house on West Davis Boulevard); in each case, the Debtor's monthly rent went

---

[62] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 4 – 10.

[63] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 4 – 10.

[64] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 37, l. 21 – p. 38, l. 11; Joint Ex. 12, Adv. Doc. No. 33-12.

[65] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 136, ll. 2 – 17; Joint Ex. 12, Adv. Doc. No. 33-12.

[66] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 38, ll. 14 – 22; Joint Ex. 12, Adv. Doc. No. 33-12.

[67] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 38, l. 23 – p. 39, l. 8; Joint Ex. 12, Adv. Doc. No. 33-12.

[68] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 38, l. 23 – p. 39, l. 8; Joint Ex. 12, Adv. Doc. No. 33-12.

up, first to $3,750 and then to $4,500.[69] The Debtor's current house on West Davis Boulevard is located on Davis Island (an exclusive Tampa neighborhood) and has a hot tub.

### 2.     The Debtor drove luxury cars.

In 2009, before he was aware of his tax obligations, the Debtor bought a used 2006 BMW 650.[70] His monthly car payment was $729 per month. Because of the number of miles the Debtor was putting on the car, which he used to travel for work, it started breaking down after a few years.[71] So, in 2013, the Debtor leased a BMW 3 series, rolling the balance owed on the 2006 BMW 650 into the lease.[72] When the lease for the BMW 3 series was up, the Debtor bought a used 2013 650i Coupe for $40,000 (plus another $12,000 in overages on his lease).[73] Eight years later, the Debtor was still driving the 2013 650i Coupe.[74]

Over the years, the Debtor's other family members drove nice cars. In 2009, the Debtor bought a Volkswagen Jetta for his daughter.[75] From 2010 to 2014, the

---

[69] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 39, l. 12 – p. 41, l. 5; Joint Ex. 12, Adv. Doc. No. 33-12.

[70] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, ll. 8 – 14.

[71] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 15 – p. 42, l. 12.

[72] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 15 – p. 42, l. 12.

[73] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 43, l. 11 – p. 44, l. 24.

[74] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 43, l. 11 – p. 44, l. 24.

[75] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 47, ll. 6 – 19.

Debtor and his first wife, Intissar, jointly owned a Lexus.[76] And, at some point, he co-signed the purchase of a Mercedes for his second wife, Sarah.[77]

### 3.    The Debtor frequently ate out at fancy restaurants and nightclubs.

During 2014 and 2015, the Debtor concedes he dined out more than usual.[78] Some of that was for business (the Debtor was doing recruiting); but personally, the Debtor was eating out more, too.[79] In fact, during those years, he was routinely spending $1,000 per month eating out and on alcohol—sometimes more than $1,500 per month.[80] And he ate at high-end restaurants and nightclubs, to boot: Eddie V's; The Black Pearl; The Epicurean; Blue Martini; etc.[81]

### 4.    The Debtor took expensive vacations.

Between 2010 and 2018, the Debtor took six international trips.[82] Three times the Debtor traveled to Spain: in 2010, the Debtor took his children to visit his family in Spain for the first time;[83] in 2015, the Debtor took another trip to Spain, this time

---

[76] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 47, ll. 20 – 25.

[77] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 49, l. 13 – p. 50, l. 25.

[78] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, ll. 1 – 19.

[79] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, ll. 1 – 19.

[80] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, l. 1 – p. 59, l. 6.

[81] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, l. 1 – p. 59, l. 6.

[82] Joint Ex. 12, Adv. Doc. No. 33-12.

[83] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 61, l. 1 – p. 62, l. 8; Joint Ex. 12, Adv. Doc. No. 33-12.

to introduce his soon-to-be second wife to his family and to visit a relative who was dying;[84] and in 2018, the Debtor flew to Barcelona (via Paris) to visit another dying relative.[85] On the last trip to Spain, the Debtor spent time in Paris, Holland, and Italy.[86]

In addition to his three trips to Spain, the Debtor took three other family vacations abroad. In July 2015, just months before his second trip to Spain, the Debtor took his kids on a three- or four-day trip to the Dominican Republic.[87] Two years later, the Debtor took a trip to Italy.[88] And in 2017, the Debtor took a three- or four-day family trip to the Bahamas.[89]

The total cost of the international trips was anywhere from $32,000 to $54,000: The three trips to Spain cost between $15,000 and $30,000; the trip to the Dominican Republic cost between $5,000 and $8,000; the trip to Italy cost between $4,000 and $10,000; and the trip to the Bahamas cost roughly $8,000.[90]

---

[84] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 63, l. 21 – p. 64, l. 14.

[85] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 65, l. 12 – p. 66, l. 22.

[86] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 65, l. 12 – p. 66, l. 22.

[87] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 61, l. 1 – p. 62, l. 1; Joint Ex. 12, Adv. Doc. No. 33-12.

[88] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 64, ll. 15 – 17; Joint Ex. 12, Adv. Doc. No. 33-12.

[89] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 61, l. 1 – p. 62, l. 1; p. 92, ll. 13 – 15; Joint Ex. 12, Adv. Doc. No. 33-12.

[90] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 63, l. 21 – p. 65, l. 11; p. 92, l. 13 – p. 93, l. 2; Joint Ex. 12, Adv. Doc. No. 33-12.

### 5.      The Debtor bought designer goods.

When the Debtor traveled abroad, he often shopped at designer stores. For instance, during his trip to Italy in 2017, the Debtor spent more than $2,000 on items from Versace, Alexander McQueen, and Dolce & Gabbana.[91] When the Debtor went back to Italy in 2018 (as part of his third trip to Spain), the Debtor spent another $1,000 on designer items.[92]

The Debtor's spending on designer items, however, was not limited to his travel abroad. One year for Christmas, the Debtor bought his first wife a Louis Vuitton purse that cost $1,000 to $1,500.[93] The Debtor also spent another $700 or so on Louis Vuitton items in July 2015.[94] And over the years, he spent hundreds of dollars at Michael Kors and Fossil.[95]

### 6.      The Debtor bought a diamond engagement ring.

Two years after the divorce from his first wife was finalized, the Debtor married his second wife, Sarah.[96] At some point between 2014 and 2016, the Debtor bought an engagement ring for Sarah. The engagement ring cost $20,000.[97] The

---

[91] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 68, l. 17 – p. 72, l. 11.

[92] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 72, ll. 12 – 23.

[93] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 72, l. 24 – p. 73, l. 25; Joint Ex. 12, Adv. Doc. No. 33-12.

[94] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 74, l. 1 – p. 75, l. 8.

[95] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 75, l. 9 – p. 77, l. 2.

[96] Joint Ex. 12, Adv. Doc. No. 33-12.

[97] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 77, ll. 3 – 19.

Debtor paid for the engagement ring by spreading the $20,000 purchase price across several credit cards.[98]

### I.     The Debtor's tax problems force him into bankruptcy.

Three years after marrying Sarah, the Debtor divorced her.[99] Sadly, it turns out Sarah became manic, disappearing for a long period of time and taking the Debtor's money with her.[100] The couple's divorce was finalized in 2019, with the Debtor paying Sarah $6,000 in lump-sum alimony.[101]

By that point, the Debtor wasn't doing well financially, and the tax problems seemed insurmountable: he kept owing more and more to the IRS, and he realized he was never going to be able to pay it in full.[102] Once again, the Debtor turned to Mish, who as it happens was a former bankruptcy attorney, and Mish recommended the Debtor talk to a bankruptcy attorney.[103] On May 6, 2019, the Debtor filed for chapter 7 bankruptcy.

---

[98] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 77, ll. 3 – 19.

[99] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 156, l. 6 – p. 157, l. 15.

[100] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 156, l. 6 – p. 157, l. 15.

[101] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 156, l. 6 – p. 157, l. 15.

[102] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 97, ll. 10 – 20; Joint Ex. 38, Adv. Doc. No. 34-16, p. 51, l. 8 – p. 61, l. 3.

[103] Joint Ex. 38, Adv. Doc. No. 34-16, p. 51, l. 8 – p. 61, l. 3.

**J.      The Debtor seeks to have his tax debt determined to be dischargeable.**

As of the petition date, the Debtor owed the IRS nearly $330,000 in unpaid taxes for taxes years 2010 – 2014.[104] The Debtor filed this adversary proceeding seeking a determination that his tax debt was dischargeable under Bankruptcy Code § 523.[105]

## II.    Conclusions of Law

Section 523(a)(1)(C) excepts from the chapter 7 discharge any tax debt that the debtor "willfully attempted in any manner to evade or defeat."[106] To determine whether a debtor willfully attempted to evade a tax debt, the Eleventh Circuit employs a two-prong test. Under the two-prong test, a debtor has willfully evaded a tax debt if he (1) engaged in evasive conduct; (2) with a mental state consistent with

---

[104] According to the Debtor's complaint, he owed more than $430,000 for tax years 2009 through 2014. Adv. Doc. No. 1, ¶ 5. The IRS, however, contends the Debtor only owes $328,691.33 in unpaid taxes, which is for 2010 through 2014. *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 3.

[105] Adv. Doc. No. 1, ¶ 6.

[106] 11 U.S.C. § 523(a)(1)(C) (providing that "[a] discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax").

willfulness.[107] The United States bears the burden of proving the "conduct" and "mental state" prongs by a preponderance of the evidence.[108]

### A.   The United States has met its burden on the "conduct" prong.

The parties agree on the standard for determining when the "conduct" prong is met: a debtor has engaged in evasive conduct if he has "engaged in affirmative acts to avoid payment or collection of taxes, either through commission or culpable omission."[109] The parties, however, disagree on whether that standard has been met here.

For his part, the Debtor argues that nonpayment of taxes alone is not enough to meet the "conduct" prong. While it's true that the Eleventh Circuit has held that nonpayment of taxes alone does not satisfy the "conduct" prong,[110] the Eleventh

---

[107] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320 (11th Cir. 2020) ("We have set forth a two-prong test for whether a tax debt is dischargeable under § 523(a)(1)(C). The government must prove by a preponderance of the evidence (1) that the debtor 'attempted in any manner to evade or defeat [a] tax,' and (2) that the attempt was done 'willfully.'") (quoting *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 921 (11th Cir. 2007)).

[108] *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir. 2000) ("The Government bears the burden to prove, by a preponderance of the evidence, that a particular claim is nondischargeable under § 523(a).").

[109] *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1327 (11th Cir. 2011); *see also Debtor's Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 48, at 9 ("The conduct requirement is met when the taxpayer 'engaged in affirmative acts to avoid payment or collection of taxes, either through commission or omission.'") (quoting *Mitchell*, 633 F.3d at 1327); *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 12 ("The United States satisfies this prong by showing that the debtor engaged either in acts of commission or culpable acts of omission.").

[110] *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1328 – 29 (11th Cir. 2001) ("To summarize, as the law of this circuit now stands, the conduct requirement of § 523(a)(1)(C) is not satisfied where a debtor has filed accurate tax returns and simply failed to pay taxes as the debtor in *Haas* did.").

Circuit has also held that nonpayment of taxes—coupled with a failure to file tax returns—does.[111]

Here, the Debtor not only failed to pay his taxes, but he failed to timely file his tax returns. Indeed, for the five tax years at issue (2010 – 2014), the Debtor filed his tax return on time only once, and even then, that was with an extension.[112] For two of the four years that he failed to timely file his tax returns, the Debtor was more than a year late.[113]

With respect to the "conduct" prong, the facts of this case are similar to those in *Mitchell*.[114] There, the debtor failed to timely file his tax returns for 1998 through 2002; he did not file those returns until 2003.[115] And for each of those years, the debtor failed to pay the taxes that were due.[116] The Eleventh Circuit held that those facts—nonpayment of taxes coupled with a failure to file tax returns—were sufficient to support a finding that the debtor engaged in evasive conduct:

> In the instant case, it is undisputed that [the debtor] failed
> to timely file tax returns for 1998 through 2002 as he did
> not file tax returns for those years until June 2003, and he

---

[111] *Mitchell*, 633 F.3d at 1327 (explaining that while nonpayment alone is insufficient to satisfy the "conduct" prong, "nonpayment in conjunction with a failure to file tax returns has been deemed to constitute evasive conduct"); *Fretz*, 244 F.3d at 1330 (holding that the debtor's "failure to file tax returns, coupled with his failure to pay his taxes, satisfy the conduct requirement of § 523(a)(1)(C)").

[112] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 4 – 9.

[113] *Id.* at ¶¶ 7 & 9.

[114] *Mitchell*, 633 F.3d at 1327.

[115] *Id.*

[116] *Id.*

> failed to pay the federal taxes he owed for those years.
> Therefore, this Court concludes that the record supports
> the findings of the bankruptcy and district courts that [the
> debtor's] failure to file tax returns and failure to pay taxes
> for 1998 to 2002 was sufficient to satisfy the conduct
> requirement of § 523(a)(1)(C).[117]

So too here. The Debtor's failure to timely file his tax returns—coupled with

his failure to pay his taxes—is sufficient to satisfy § 523(a)(1)(C)'s conduct prong.

Thus, whether the Debtor is entitled to a discharge turns on whether the Debtor's

evasive conduct was willful.

### B.   The United States failed to meet its burden on the "mental state" prong.

As is the case with the "conduct" prong, the parties generally agree on the

standard for determining when the "mental state" prong is met: the mental state

prong is met when the government proves that (1) the debtor had a duty under the

law; (2) the debtor knew that he had a duty; and (3) the debtor voluntarily and

intentionally violated that duty.[118]

---

[117] *Id.*

[118] *Id.* ("The required mental state is shown when the Government proves that the debtor: (1) had a duty under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated the duty."); *see also Debtor's Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 48, at 10 – 11 ("The required mental state is shown when the '[g]overnment proves that the debtor: (1) had a duty under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated the duty.'") (quoting *In re Mitchell*, 633 F.3d at 1327); *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 15 ("Under the mental prong, the United States must demonstrate that '(1) the debtor had a duty under the law, (2) the debtor knew he had that duty, and (3) the debtor voluntarily and intentionally violated that duty.'") (quoting *United States v. Griffith (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir. 2000)).

There is, of course, no dispute that the Debtor had a duty to pay income taxes. It is likewise undisputed that the Debtor knew he had a duty to pay taxes on the income he earned.[119] The real dispute here is whether the Debtor voluntarily and intentionally violated his duty to pay taxes.[120]

To determine whether he voluntarily and intentionally violated his duty to pay taxes, the Debtor says the Court should look to traditional "badges of fraud": understatement of income, implausible or inconsistent explanations of behavior, inadequate records, transfer of assets to a family member, transfers for inadequate consideration, and transfers that greatly reduce the assets subject to execution.[121] Because none of those "badges of fraud" are present here, the Debtor contends that the IRS has not met its burden of proving he voluntarily and intentionally violated his duty to pay his taxes.[122]

---

[119] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 26, ll. 7 – 12.

[120] *Debtor's Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 48, at 11 ("Here, the only issue at hand is whether the Debtor voluntarily and intentionally violated his duty to pay the Tax Obligations.").

[121] *Debtor's Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 48, at 11 ("The mens rea of willfulness can be shown by 'badges of fraud,' such as the understatement of income, implausible or inconsistent explanations of behavior, inadequate records, transfer of assets to a family member, transfer for inadequate consideration, and transfer that greatly reduces assets subject to IRS execution.") (quoting *United States v. Rhodes (In re Rhodes)*, 2008 WL 958078, at *2 (M.D. Fla. Apr. 8, 2008)).

[122] *Id.* at 11 – 12.

The United States, however, counters that willfulness can be inferred from a debtor's high discretionary spending.[123] Quoting Bankruptcy Judge Karen S. Jennemann, the IRS contends that "[t]he law is clear that taxpayers who have the money to pay their taxes must do so first, before paying other expenses, or, instead, live with the unfortunate consequences."[124]

It is true, as the IRS contends, that willfulness can be inferred from high discretionary spending.[125] Two years ago, in *In re Feshbach*, the Eleventh Circuit explained that "excessive spending constitutes circumstantial evidence of willfulness."[126] And, by this Court's count, the Eleventh Circuit has affirmed the nondischargeability of tax debt in at least three cases involving excessive spending: *In re Feshbach*, *In re Jacobs*, and *In re Mitchell*.

The most egregious case was *Feshbach*. There, the debtors, who sought to discharge nearly $4 million in tax debt, spent more than $8.5 million on personal expenses.[127] Those expenses included more than $700,000 for travel; $610,000 for hired help and a personal chef; $500,000 for clothing; $370,000 for groceries;

---

[123] *United States' Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 16 (citing *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320, 1331 – 32 (11th Cir. 2020) (explaining that "we have held that excessive discretionary spending constitutes circumstantial evidence of willfulness")).

[124] *Schwartz v. United States (In re Schwartz)*, 2009 WL 361383, at *3 (Bankr. M.D. Fla. 2009) (Jennemann, J.).

[125] *Feshbach*, 974 F.3d at 1331 – 32.

[126] *Id.* (citing *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1329 (11th Cir. 2011)).

[127] *Id.* at 1326, 1326 n.2.

$230,000 to rent a house in Aspen, Colorado for two years; $120,000 for entertainment; and $75,000 for dining out.[128] On top of that, there were (in round numbers) another $1 million in "other" personal expenses and $500,000 in charitable contributions.[129]

The remaining two cases—*Jacobs* and *Mitchell*—were far less egregious, relatively speaking. In *Jacobs*, for instance, the debtor spent $20,000 on plastic surgery for his wife; paid more than $1,000/month for a golf club membership; paid $600 – $700/month for a leased Mercedes-Benz for his wife, even though the couple drove other luxury cars; donated nearly $25,000 to charity; and gave thousands of dollars to his kids.[130] In *Mitchell*, the debtor bought a house for $200,000; three years later, the debtor sold that house and bought a new house for $465,000; and, over the years, the debtor repaid a $30,000 personal loan; bought stock in Compaq and Intel; bought three time shares, which required nearly $4,000 in down payments, plus monthly payments ranging from $100 to $250; invested $100/month during a four-year period; and donated $81,000 to his church.[131]

---

[128] *Id.* at 1326 n.2.

[129] *Id.* at 1326, 1326 n.2.

[130] *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 926 (11th Cir. 2007).

[131] *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1324 – 26 (11th Cir. 2011).

Here, like in *Jacobs* and *Mitchell*, there is evidence of high discretionary spending. For instance, the Debtor lived in expensive homes;[132] drove luxury cars;[133] bought designer goods;[134] ate out at fancy restaurants;[135] and took international trips.[136] But, while that evidence of high discretionary spending can be circumstantial evidence of willfulness, whether the Debtor willfully attempted to evade his taxes must be determined from a totality of the circumstances.[137]

In *Feshbach*, *Jacobs*, and *Mitchell*, there was additional evidence—beyond excessive spending—from which the courts could infer the debtors willfully attempted to evade their taxes. In *Mitchell*, for instance, there was direct evidence of willfulness—i.e., the debtor admitted he deliberately tried to avoid paying his taxes.[138] In *Jacobs* and *Mitchell*, there was evidence that the debtors' failure to pay

---

[132] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 37, l. 21 – p. 41, l. 5; p. 136, ll. 2 – 17; Joint Ex. 12, Adv. Doc. No. 33-12.

[133] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 8 – p. 42, l. 12; p. 47, ll. 6 – 25; p. 49, l. 13 – p. 50, l. 25.

[134] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 68, l. 17 – p. 77, l. 2.

[135] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, l. 1 – p. 59, l. 6.

[136] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 61, l. 1 – p. 62, l. 8; p. 63, l. 21 – p. 66, l. 22; p. 92, l. 13 – p. 93, l. 2; Joint Ex. 12, Adv. Doc. No. 33-12.

[137] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320, 1331 (11th Cir. 2020) (holding that the "mental state" prong is satisfied "[i]f the totality of the circumstances tends to show that [the debtors] acted voluntarily and intentionally in their attempts to evade or defeat the payment of taxes").

[138] *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1323 – 24, 1329 (11th Cir. 2011).

25

taxes was not the result of a mistake.[139] In *Feshbach*, there was ample evidence the debtors exploited the the offer-in-compromise process to delay payment of taxes,[140] while in *Mitchell*, there was evidence the debtor threatened the IRS.[141] And in *Jacobs* and *Mitchell*, there was evidence the debtors attempted to conceal assets.[142] Thus, the totality of the circumstances in those cases (including evidence of excessive spending) supported a finding that the debtors were willfully attempting to evade their taxes.

This case is different from *Feshbach*, *Jacobs*, and *Mitchell*. There was no direct evidence here that the Debtor deliberately tried to avoid paying his taxes. To the contrary, there was evidence that his initial failure to pay taxes was the result of a mistake. Moreover, there was no evidence that the Debtor tried to abuse the offer-in-compromise process or conceal assets. And while his discretionary spending was high, it was not necessarily excessive or lavish. For that reason, even though there is evidence of high discretionary spending in this case, the totality of circumstances does not warrant a finding of willfulness.

---

[139] *In re Mitchell*, 633 F.3d at 1323; *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 916 – 17 (11th Cir. 2007).

[140] *Feshbach*, 974 F.3d at 1328 – 30.

[141] *In re Mitchell*, 633 F.3d at 1328 – 29.

[142] *In re Jacobs*, 490 F.3d at 917 – 18, 925 – 27; *In re Mitchell*, 633 F.3d at 1324, 1328 – 29.

### 1. There is no direct evidence the Debtor willfully attempted to evade his taxes.

In *Mitchell*, there was direct evidence the debtor willfully attempted to evade his taxes. There, the debtor had filed his tax returns and paid his taxes for twelve years.[143] Then, one year, the debtor simply stopped filing his tax returns and paying his taxes.[144] When asked why he stopped paying his taxes, the debtor essentially admitted he was trying to fly under the radar:

> When asked at trial why he had not paid anything towards his past due taxes even though in 2001 he earned over $170,000, Mitchell responded: "[i]t doesn't take a rocket scientist to figure out that I'm going to owe somewhere around [$]300,000 plus interest and penalties. So at that point, I haven't filed anything. I don't have [$]300,000. I don't want to open this up yet."[145]

There was other direct evidence in *Mitchell*, too. For instance, the debtor admitted that he bought a house in his wife's name, instead of his own, because he knew the IRS could levy his assets.[146] The debtor, who was a realtor, also admitted to setting up a realty company with his wife as the sole officer, director, and shareholder so he could continue selling real estate without the IRS garnishing his commissions.[147] The Eleventh Circuit held that the direct evidence, coupled with

---

[143] *In re Mitchell*, 633 F.3d at 1323.

[144] *Id.*

[145] *Id.* at 1323 – 24.

[146] *Id.* at 1329.

[147] *Id.*

circumstantial evidence of (among other things) excessive spending, was sufficient to prove the debtor in *Mitchell* acted willfully. Although there is evidence of high discretionary spending in this case, there is no direct evidence the Debtor acted willfully.

### 2. The Debtor initially fell behind on his taxes because of a mistake.

In *Jacobs* and *Mitchell*, the Eleventh Circuit confirmed that inadvertent mistakes are insufficient to satisfy the "mental state" prong (i.e., to prove willfulness).[148] Neither *Jacobs* nor *Mitchell* involved an inadvertent mistake. The debtor in *Jacobs* fell behind on his taxes because he had the law firms he owned treat his income as officer compensation (rather than as wages for a salaried employee), so the law firms did not withhold taxes from the debtor's compensation or pay withheld taxes on his behalf.[149] In *Mitchell*, the debtor fell behind on his taxes because he simply stopped paying them (he says because his living, business, and divorce expenses exhausted his income).[150]

---

[148] *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 924 (11th Cir. 2007) ("[T]his Court explained in *Fretz* that '[t]he third or willfulness component of [§ 523(a)(1)(C)'s] mental state requirement "prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate."'" (quoting *In re Fretz*, 244 F.3d at 1330)); *In re Mitchell*, 633 F.3d at 1327 – 28 ("In *Fretz*, we held that '[t]he third or willfulness component of the mental state requirement "prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate."'" (quoting *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1330 (11th Cir. 2001))).

[149] *In re Jacobs*, 490 F.3d at 916 – 17.

[150] *In re Mitchell*, 633 F.3d at 1323.

28

Unlike the debtors in *Jacob* and *Mitchell*, the Debtor here fell behind on his taxes—at least initially—because of a mistake. Until becoming a doctor in private practice, the Debtor had always been a W-2 employee, and as a W-2 employee, he had always had taxes withheld from his paycheck.[151] It wasn't until the Debtor completed his fellowship and took a job with a radiology practice in 2009 that he became employed as a "1099" independent contractor for the first time.[152] When the Debtor took his first 1099 position, however, he wasn't aware of the need to make estimated tax payments.[153] By the time the Debtor figured out he needed to make estimated tax payments, he was already more than $160,000 behind on his taxes.[154]

The Court found the Debtor's testimony that he was unaware of the need to make estimated tax payments credible. Thus, this case is distinguishable from *Jacobs* and *Mitchell*.

To be sure, not all the Debtor's failure to pay taxes was attributable to a mistake. By late 2010, the Debtor was aware of the need to file estimated tax payments.[155] While the Debtor did make more than $210,000 in estimated tax

---

[151] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 32, l. 1 – p. 33, l. 11; p. 133, ll. 17 – 24; p. 134, ll. 11 – 20; Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 20.

[152] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 133, ll. 17 – 24.

[153] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 32, l. 1 – p. 33, l. 11; p. 135, l. 10 – p. 136, l. 1. Nor was he prepared for the increase in his tax rate when he went from his fellowship to private practice. Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 21.

[154] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 32, l. 1 – p. 33, l. 11; p. 135, l. 10 – p. 136, l. 1; Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 12.

[155] Joint Ex. 17, Adv. Doc. No. 33-17.

payments after learning he was required to do so (while also paying another $71,000 under an installment agreement), the estimated tax payments were not sufficient. It is also worth noting that, in 2012, Mish (the Debtor's tax attorney) told the Debtor to stop making payments to the IRS while Mish was trying to negotiate an installment agreement.[156] In any event, by the time the Debtor learned he was supposed to make estimated tax payments, he had already dug himself a deep hole on his taxes, and because his income later took a hit and he became ensnared in a costly divorce, the Debtor's hole only got deeper.

### 3. Although high, the Debtor's disposable income was not as high as the IRS suggests.

In *Jacobs*, the Eleventh Circuit recognized that excessive spending was relevant to the "conduct prong" if the debtor was capable of meeting his or her tax debts but failed to do so.[157] Surely, the same is true for the "mental state" prong. In other words, excessive spending is evidence of willfulness if the debtor fails to pay his taxes when he is capable of doing so.

Here, the IRS makes much of the fact that during the tax years in question, the Debtor's gross income was—on average—$400,000 per year.[158] And, the IRS points

---

[156] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 25.

[157] *In re Jacobs*, 490 F.3d at 926 (explaining that "large discretionary expenditures, when a taxpayer knows of his or her tax liabilities, is capable of meeting them, but does not, are relevant to § 523(a)(1)(C)'s conduct element").

[158] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 28, l. 23 – p. 29, l. 10; p. 31, ll. 13 – 16.

out, in some of those years the Debtor's gross income was nearly $500,000.[159] But simply looking at the $400,000 average income is misleading for three reasons.

First, the $400,000 income was the Debtor's *gross* income—not his *net* income. Because the Debtor was a 1099 employee, he was responsible for paying his own business expenses.[160] Those expenses were, on average, $60,000 per year.[161] The Debtor also had non-business expenses that he had to pay: student loans and domestic support obligations. It was undisputed that the Debtor was paying $2,200/month on his student loans, which comes out to $26,400/year.[162] As for his domestic support obligations, the Debtor was paying as little as $10,000 – $15,000 per year when he had primary custody of his children and as much as $156,000 per year when he did not.[163] So, depending on the year, the Debtor's average "net income"—after accounting for business expenses, student loans, and domestic support obligations—ranged anywhere from $158,000 to $299,000. While certainly not "chump change," $158,000 – $299,000 does represent a 25% to 40% reduction of the Debtor's gross income.

---

[159] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 31, ll. 13 – 18.

[160] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 134, ll. 11 – 20.

[161] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 31, ll. 5 – 12.

[162] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 158, ll. 20 – 23.

[163] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 139, l. 3 – p. 140, l. 24; p. 159, l. 12 – p. 160, l. 16.

Second, when looking at the Debtor's gross income, not only does the IRS fail to account for the expenses the Debtor was required to pay, but it also fails to account for the fact that the Debtor paid more than $280,000 to the IRS between 2010 and 2014. According to the IRS transcripts, the Debtor paid $210,646 in estimated tax payments between 2010 and 2014.[164] That doesn't include the payments the Debtor made on his installment agreement, which totaled $71,275.[165] On average, then, the Debtor paid the IRS roughly another $56,000/year. In round numbers, that further reduces the Debtor's income to $150,000 to $200,000 per year between 2010 and 2014.

Third, while the Debtor's gross earnings were high during the tax years in question (2010 – 2014), when he incurred the tax debt, the IRS fails to account for the fact that the Debtor's income decreased significantly after 2014. While the record at trial paints a somewhat incomplete picture, it appears undisputed that the Debtor's *adjusted* gross income for 2016, 2017, and 2018 (which is not an apples-to-apples comparison to his 2010 – 2014 *gross* income) was $181,621; $177,473; and $222,488, respectively. Thus, it appears undisputed the Debtor's income was roughly cut in half by 2016.

None of this is to say that the Debtor was destitute—or that he had no ability to pay his taxes. But, in considering the totality of the circumstances, and in

[164] Joint Exs. 2 – 6, Adv. Doc. Nos. 33-2 – 33-6.

[165] Joint Exs. 1 & 4, Adv. Doc. Nos. 33-1 & 33-4.


particular the Debtor's ability to pay his taxes, it is important to note that the Debtor's disposable income was anywhere from 25% to 50% less than the IRS says was available to him.

### 4.    The Debtor's spending was not immoderate.

In *Feshbach*, the bankruptcy court found that the debtors' attempt to evade their taxes was willful, which the Eleventh Circuit affirmed, because (among other reasons) the debtors "spen[t] millions of dollars on their upscale lifestyle rather than paying down their debt."[166] Based on what it characterized as "immoderate spending choices," the bankruptcy court concluded that the debtors led a "life of excess" and were "focused on living in the lap of luxury."[167]

Here, while it is true the Debtor's spending was high, the Court is not convinced his spending choices were immoderate. For instance, the Debtor's housing choices were justified based on the Debtor's family and business needs. The Debtor has only driven one car at a time—first leasing a base-model BMW and then later buying a used one, which he still drives today. The Debtor's spending on dining out and designer items was not, based on the record at trial, excessive or lavish. The Debtor's spending on vacations could be considered excessive, but that was

---

[166] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 576 B.R. 660, 682 (Bankr. M.D. Fla. 2017) (McEwen, J.); *cf. Looft v. United States (In re Looft)*, 533 B.R. 910, 920 (Bankr. N.D. Ga. 2015) (Ellis-Monro, J.) (finding that debtor was entitled to discharge his tax debt even though he maintained an affluent lifestyle because (among other reasons) the debtor's spending, even if it could be characterized as excessive in some ways, "was not entirely unrestrained").

[167] *In re Feshbach*, 576 B.R. at 684.

mitigated by the fact that not all his trips were for pleasure, and, more important, his second wife paid for most of the costs. And while the $20,000 engagement ring could likewise be considered excessive, the evidence was that the Debtor spread that balance out over several credit cards.

### a. Given his family and business needs, the Debtor's housing choices appear justified.

In *Mitchell*, the debtors, despite owing four years of unpaid taxes, bought a house for $200,000.[168] Then, three years later, they sold their house and bought a newly constructed house for more than double the cost of their old one.[169] In holding that the bankruptcy court clearly erred in finding insufficient evidence of willfulness, the Eleventh Circuit pointed to (among other things) evidence that the debtors upgraded their house. No mention was made in *Mitchell* why the debtors bought a home, sold it three years later, and bought a new one for double the cost of the old one.

Here, the Debtor, like the debtor in *Mitchell*, upgraded his housing. As the IRS points out, the Debtor went from a $2,000/month condominium, which he lived in before becoming aware of his tax problems, to a $4,500/month house with a hot tub in an exclusive neighborhood, which he lived in after accruing hundreds of

---

[168] *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1324, 1328 (11th Cir. 2011).

[169] *Id.* at 1328.

thousands in unpaid taxes.[170] But, unlike the debtor in *Mitchell*, the Debtor here offered evidence justifying his upgrade in housing.

For instance, the Debtor explained that he moved from his first condo to another one in 2012 because he and his first wife had just separated, and he needed a place to live.[171] When he moved into bigger (more expensive) houses in 2014 and 2016, it was because he had begun living with his soon-to-be second wife, Sarah, and they needed separate bedrooms for each of his daughters (one was ten years old; the other was seventeen) and Sarah's son.[172] Plus, the Debtor needed a room for an office.[173] If the Debtor didn't have a home office, he probably would have had to rent office space somewhere else, which would have cost money.[174] Not to mention Sarah was paying 20% of the household costs.[175]

The IRS, however, focuses on the fact that, as of the petition date, the house the Debtor was renting on Davis Boulevard, which he was living in by himself, was in "an exclusive neighborhood fit for celebrities" and that the Debtor had not

---

[170] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 37, l. 21 – p. 41, l. 5; p. 136, ll. 2 – 17; Joint Ex. 12, Adv. Doc. No. 33-12.

[171] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 37, l. 25 – p. 38, l. 18.

[172] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 38, l. 23 – p. 39, l. 24; p. 162, l. 13 – p. 163, l. 25.

[173] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 38, l. 23 – p. 39, l. 24; p. 162, l. 13 – p. 163, l. 25.

[174] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 38, l. 23 – p. 39, l. 24; p. 162, l. 13 – p. 163, l. 25.

[175] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 38, l. 23 – p. 39, l. 24.

attempted to downsize.[176] Again, the Debtor has a credible explanation for that
housing choice.

For starters, the Debtor had to move from his previous house because the
owner no longer wanted to rent it out.[177] As for the neighborhood, it was in the Plant
School District, where the Debtor and his first wife had always lived; in his divorce
from his first wife, the Debtor agreed to remain in that school district for his
daughters' benefit.[178] At the time he signed the lease for the Davis Boulevard house,
he was living with his second wife, Sarah, and the Debtor still needed room for his
daughters, Sarah's son, and an office.[179] Shortly before moving in, however, the
Debtor and Sarah had separated.[180] That explains why the Debtor was living in a
large house in an exclusive neighborhood.

On its face, a large house (with a hot tub) in an exclusive neighborhood may
appear immoderate. But considering the need for separate bedrooms for children of
different sexes and ages, and for office space that he otherwise would have had to
pay for, not to mention an agreement with his ex-wife to live in the same school

---

[176] *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 11.

[177] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 162, ll. 13 – 25.

[178] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 162, l. 13 – p. 163, l. 5.

[179] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 163, ll. 6 – 24.

[180] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 40, ll. 8 – 23.

district, the Court is not convinced the Debtor's housing choices were excessive or lavish.

>   **b.    Driving a used $40,000 BMW
>         predominantly for work is not excessive or
>         lavish.**

In *Jacobs*, the debtor owed unpaid taxes for 1991 – 1995, 1997, and 1998, and his family owned or drove a number of luxury cars. The debtor bought a 1997 Chrysler Town & Country minivan for $36,000, which he later traded in for a Jeep; his law firm bought two late-model Chevrolet Suburbans, which the debtor drove for business and personal purposes; and the debtor later traded in the 2001 Chevrolet Suburban for a new 2003 GMC Yukon.[181] In addition to those cars, the debtor also leased a Mercedes-Benz, which cost around $600 – $700/month.[182] In holding that the bankruptcy court erred in finding that the debtor did not act willfully, the Eleventh Circuit concluded the debtor's failure to pay his taxes while making "large loans and expenditures," which would have included payments for the cars, showed he acted voluntarily, consciously or knowingly, or intentionally.[183]

Here, the IRS tries to paint the Debtor in the same light as the debtor in *Jacobs*. According to the IRS, the Debtor leased a new 2013 BMW 3 Series, which cost

---

[181] *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 918 – 19 (11th Cir. 2007).

[182] *Id.* at 926.

[183] *Id.* at 926 – 27.

$729/month.[184] Then, in 2015, when the lease for the BMW 3 Series ended, the IRS points out the Debtor bought a BMW 650i Coupe.[185] The IRS also points out that the Debtor's family members drove luxury cars, too: one of the Debtor's daughters drove a Volkswagen Jetta; the Debtor's first wife, who was a schoolteacher, drove a Lexus; and the Debtor's second wife drove a Mercedes.[186]

But those facts need to be put into context. Take the Volkswagen Jetta and the Lexus: both of those cars were purchased before the Debtor incurred his tax debt.[187] And the Debtor stopped making payments on the Jetta and the Lexus in 2012,[188] which was not long after the Debtor first incurred or became aware of his tax liability. How about the Mercedes? Although the Debtor co-signed for the loan on that car, his second wife made all the payments for the Mercedes (except for when she took a three-month sabbatical, during which the Debtor *may* have made the payments).[189] So, for purposes of this case, the Jetta, Lexus, and Mercedes are irrelevant.

---

[184] *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 4; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 11 – p. 42, l. 25.

[185] *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 6; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 43, l. 11 – p. 47, l. 5.

[186] *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 6 – 7; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 47, l. 6 – p. 48, l. 3; p. 49, ll. 13 – 15.

[187] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 47, l. 6 – p. 49, l. 12.

[188] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 47, l. 6 – p. 49, l. 12.

[189] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 49, l. 13 – p. 50, l. 25.

Of course, the Debtor's BMWs are relevant. But some history is worth noting: in 2009, before the Debtor incurred his tax liability, he bought a used BMW 650, which he used for work.[190] When the car started to break down, he decided to lease a car rather than buy one.[191] Because he had a balance due on the loan for the BMW 650, and he was going to have to roll that balance into any loan for a new car, he decided to lease another BMW, though he opted to lease the least expensive model (a BMW 3 Series).[192] Although his monthly payment (which was $729/month) did not go down, only $430 or so of the monthly payment was attributable to his personal use because he used the car for work.[193]

When the lease for the BMW 3 Series ended, he was about 12,000 miles over the lease because of all his work-related travel, so he realized leasing was not the best financial decision.[194] Rather than lease a new car, the Debtor opted to buy a used BMW 650i coupe.[195] The total purchase price was around $52,000, but that included $12,000 owed on the prior lease, which was rolled into the purchase.[196] So the value

---

[190] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 8 – p. 43, l. 5.

[191] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 8 – p. 43, l. 5.

[192] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 8 – p. 43, l. 5.

[193] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 41, l. 8 – p. 43, l. 5.

[194] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 43, l. 11 – p. 44, l. 1.

[195] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 43, l. 11 – p. 44, l. 1.

[196] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 44, ll. 14 – 22.

of the car at the time of purchase was $40,000.[197]As of the petition date, the Debtor

was still driving the BMW 650i, which had roughly 130,000 miles on it.[198]

It is undisputed the Debtor needed a reliable car for work. He opted to lease

the least expensive BMW model, and then when that lease was over, he opted to buy

a used BMW for $40,000, which he was still driving as of the petition date. On those

facts, the Court is not convinced the Debtor's choice of cars is excessive or lavish.

### c.   Even if the Debtor's dining out was excessive at one point, he has since moderated it.

In *Feshbach*, the debtors spent (over a seven-year period) more than $75,000 in

dining out—and that was on top of more than $370,000 in groceries.[199] Here, the IRS

says that in 2014 and 2015, which the Debtor described as the height of his dining

out, the Debtor routinely spent more than a $1,000/month dining out at

restaurants.[200] In particular, the IRS points to $12,200 the Debtor spent in dining out

as excessive: $2,000 in January 2014; $5,800 between February 2015 and April 2015;

and $4,400 between March 2018 and May 2018.[201]

---

[197] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 44, ll. 14 – 22.

[198] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 43, l. 11 – p. 44, l. 1.

[199] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320, 1326 n.2 (11th Cir. 2020).

[200] *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 4, 5, 10; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, l. 1 – p. 59, l. 25.

[201] *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 4, 5, 10; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, l. 1 – p. 59, l. 25. That is not to say the Debtor only spent $12,200 dining out. That was the spending the IRS focused on at trial and in its post-trial brief. *United States'*

While the Debtor concedes he spent $1,000/month dining out in 2014 and 2015, he offered necessary context at trial. For instance, the Debtor explained that some of the dining was for business reasons: at the time, he was heavily recruiting physicians and administrators, so he often took them out to eat.[202] And while some (presumably most) of the dining out was personal, the Debtor points out that often his whole family (five people in all) ate out instead of cooking at home, so he was not spending much on groceries.[203]

But, perhaps most important, the Debtor testified that once he realized how expensive eating out was, he decided it was not the best thing to do.[204] Because of that, the Debtor testified he does not dine out with the same frequency he once did.[205] That testimony largely went unrebutted, save for the IRS putting on evidence that the Debtor spent $4,400 on dining out over a three-month period in 2018 (three years after the Debtor says he stopped eating out).[206]

While spending $1,000/month on dining out may not be the most economical decision, it is hard to conclude, on the record in this case, whether a busy

---

*Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 4, 5, 10; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, l. 1 – p. 59, l. 25.

[202] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, ll. 1 – 19.

[203] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 53, ll. 4 – 14; p. 59, ll. 10 – 19.

[204] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 51, ll. 1 – 19.

[205] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 53, l. 15 – p. 54, l. 3.

[206] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 59, ll. 20 – 25; Joint Ex. 36, Adv. Doc. Nos. 34-1 – 34-3.

professional spending that amount to feed a family of five is excessive or lavish. Even

if it is, it appears that once the Debtor realized how expensive dining out can be, the

Debtor moderated his dining out.

> **d.** **Although the Debtor's vacations may appear excessive, not all of them were for pleasure, and it appears the Debtor's second wife paid for most of the costs.**

*In Feshbach*, the debtors spent (over a seven-year period) nearly three quarters

of a million dollars on travel.[207] In addition, the debtors spent nearly another quarter

of a million dollars on a vacation home in Aspen, Colorado.[208] Here, although the

Debtor spent far less on travel than did the debtors in *Feshbach*, he still spent a

substantial amount of money: between 2015 and 2018, the Debtor spent somewhere

between $27,000, on the low end, and $46,000, on the high end, on five international

trips (likely toward the lower end of that range because, to be safe, the Debtor

overestimated his costs so he would not be accused of trying to hide something).[209]

But the Debtor explains those trips weren't all for pleasure. Take his 2015 trip

to Spain. The Debtor says that trip was to visit a relative who was dying.[210] So too

---

[207] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320, 1326 n.2 (11th Cir. 2020).

[208] *Id.*

[209] Joint Ex. 12, Adv. Doc. No. 33-12; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 62, l. 2 – p. 63, l. 2. The Debtor also traveled to Spain in 2010. Joint Ex. 12, Adv. Doc. No. 33-12. But that was before the Debtor became aware of his tax liability.

[210] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 63, l. 21 – p. 64, l. 14.

was his trip to Europe in 2018.[211] And four of the five trips between 2015 and 2018 were taken while the Debtor believed his offer in compromise was pending.[212]

The Debtor also points out that his second wife, Sarah, helped pay for the trips. While the Debtor and Sarah had agreed she would be responsible for roughly 20% of the household expenses, they had also agreed she would "be responsible, to a significant extent, for if and when [the couple] took vacations."[213] It appears unrebutted that the Debtor's second wife paid a significant portion of any vacations the couple took.

### e.   Buying heavily discounted items is not excessive or lavish simply because the items have designer labels.

In *Feshbach*, the debtors spent (over a seven-year period) more than $500,000 on clothing.[214] Not to suggest *Feshbach* sets the baseline for excessive spending, but the spending here on designer clothes and goods was miniscule compared to *Feshbach*. In all, the IRS here points the Court to roughly $6,500 in designer goods the Debtor bought over several years: $893.50 from Michael Kors; $747.61 at Fossil; $289 from Dolce & Gabbana; $685 from Alexander McQueen; $1,156 from Versace;

---

[211] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 65, l. 12 – p. 66, l. 22.

[212] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 87, l. 1 – p. 88, l. 17; Joint Ex. 29, Adv. Doc. No. 34-8.

[213] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 65, l. 12 – p. 67, l. 23.

[214] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320, 1326 n.2 (11th Cir. 2020).

$1,000 from Louis Vuitton for a purse; $1,000 from Neiman Marcus for shoes; and $1,000 while on a trip to Italy.[215]

It appears the Debtor bought most of those items from outlets in Europe. Not only are designer items heavily discounted at the outlets in Europe (as much as 50% according to the Debtor), but the Debtor says he bought the items during one of Europe's two annual sales seasons, in which items are further discounted another 50 – 80%.[216] On top of that, the Debtor was refunded the value-added tax (VAT).[217] Hypothetically, the Debtor says that when taking into account the discounts and VAT refund, he could buy a $200 designer item for $40.[218]

And the Debtor points out that he only went clothes shopping once or twice a year.[219] The Debtor argues that, to determine whether his spending on clothes and other items (shoes, purses, etc.) was excessive, the focus should be on the amount he spent on clothing and personal items—not whether the items have designer labels:

> [T]he reason I tell you this is because you point out that they're designer items, but let's say if it were a Wal-Mart, if I spend $40 on a pair of pants at Wal-Mart, no one would say anything. If I spend $40 on a pair of pants at a designer label, then, you know, your eye was caught. But in the end, it was – that's what wound up happening.

---

[215] *United States' Proposed Findings of Fact & Conclusions of Law*, Adv. Doc. No. 49, at 6 – 8 & 11; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 68, l. 17 – p. 77, l. 2.

[216] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 68, l. 17 – p. 69, l. 13.

[217] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 68, l. 17 – p. 69, l. 13.

[218] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 68, l. 17 – p. 69, l. 13.

[219] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 69, l. 14 – p. 70, l. 11.

> And then when you look at my spending on clothing items throughout the span of a year, you'll see that we only went shopping for clothes maybe once or twice in a year. So, I mean, I don't know.
>
> I definitely don't go shopping every month for clothes or every other month or every – even every quarter or even six months. It usually comes down to maybe, you know, once or twice. You know, maybe Christmas, and then one other time when there are good sales.
>
> But in the grand – when you look at the big picture, I know the amounts that you're referring to, I know the purchases that you're referring to, but to buy them at a deep – at a very significant discount and then only doing clothing purchases once or twice in a year, when you divide it out, I think the numbers show something extreme – something very, very different.[220]

The IRS did not offer any evidence to contradict the Debtor's claim that he only went shopping once or twice a year. Nor did it offer any evidence that the Debtor's shopping on clothes and personal items was excessive. And it is worth noting that the Debtor's second wife, Sarah, paid for some of the $6,500 in designer goods.[221]

On its face, buying $6,500 worth of "designer" items may appear excessive. But the IRS does not contend that the Debtor's spending on clothing or personal items is otherwise expensive. Put another way, had the Debtor and his wife spent $6,500 on non-designer clothing and personal items over several years, it would not

---

[220] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 69, l. 15 – p. 70, l. 11.

[221] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 72, ll. 2 – 7.

have been deemed excessive or lavish. It does not become excessive or lavish simply because the clothing and personal items have designer labels.

> **f.      Although a $20,000 engagement ring may
> be excessive or lavish, the Debtor paid for it
> on credit.**

Perhaps the most excessive or lavish item of the Debtor's personal spending was the $20,000 engagement ring. The Debtor points out that he did not pay cash for the ring. Instead, he bought it on credit, spreading the amount out over several credit cards.[222]

> **5.      The Debtor made good-faith attempts to resolve
> his tax debt with the IRS.**

In *Feshbach*, the Eleventh Circuit, in affirming the bankruptcy court's finding of willfulness, noted that the bankruptcy court had "inferred willfulness from the [the debtors'] exploitation of the offer-in-compromise process."[223] The evidence in that case established that the debtors had done their "homework" and were familiar with the Tax Code and IRS regulations; while negotiating with the IRS, the debtors promised to reduce their expenses and sell their house to pay down their tax debt but never did so; the debtors submitted inadequate and unrealistic offers to the IRS; and there were vast disparities between the income the debtors reported to the IRS while negotiating a resolution of their tax debt and the income they actually earned.[224] On

---

[222] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 77, ll. 3 – 19.

[223] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320, 1331 – 32 (11th Cir. 2020).

[224] *Id.* at 1329 – 30.

that last point, the debtors offered to settle their tax debt for pennies on the dollar, claiming to make less than $10,000/year, when it turns out they actually made close to $200,000 that year.[225]

In *Mitchell*, the debtor also acted in bad faith when dealing with the IRS.[226] There, while negotiating an offer in compromise, the debtor's lawyer sent a letter to the IRS warning the IRS that if the IRS did not accept the debtor's offer, the debtor could end up filing for bankruptcy and discharging his tax debt.[227] The Eleventh Circuit construed that warning as a threat: accept the debtor's offer in compromise, which sought to settle more than $200,000 in tax debt for $35,000, or else.[228]

Here, unlike in *Feshbach* and *Mitchell*, the Debtor did not deal with the IRS in bad faith. As soon as he discovered he owed significant back taxes, the Debtor, who was not sophisticated when it came to tax matters, retained a tax attorney.[229] And, even though he had retained a tax attorney, it appears the Debtor reached out to the IRS directly and negotiated an installment agreement that required him to pay $3,000/month, which he performed under for two years.[230] After he defaulted on the

---

[225] *Id.* at 1330.

[226] *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1328 – 29 (11th Cir. 2011).

[227] *Id.* at 1328.

[228] *Id.* at 1328 – 29.

[229] Joint Ex. 32, Adv. Doc. No. 34-11, ¶ 26; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 137, l. 17 – p. 138, l. 17.

[230] Joint Ex. 32, Adv. Doc. No. 34-11, ¶¶ 27 & 30; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 137, l. 17 – p. 139, l. 2.

installment agreement, the Debtor retained the tax attorney again to submit an offer in compromise.[231]

In fairness, the Debtor had some bumps along the way in his dealings with the IRS. For one thing, even though the Debtor retained Mish to submit an offer in compromise before the IRS issued a notice of intent to levy, the Debtor's offer in compromise wasn't actually submitted until after the IRS issued its notice.[232] The Debtor attributes the delay to his mistaken belief that Mish's office had all the documents it needed to submit the offer.[233] Mish, however, points the finger at the Debtor, saying the Debtor, who always characterized himself as "extraordinarily busy," didn't always pay as much attention to this matter as he could have.[234]

For another, the Debtor's offer in compromise was low. The Debtor's original offer to resolve hundreds of thousands of tax debt was only $10,000.[235] His counteroffer was not much better: $20,000.[236] And it appears there were some

---

[231] Joint Ex. 31, Adv. Doc. No. 34-10; Trial Tr. Vol. I, Adv. Doc. No. 41, p. 85, l. 21 – p. 86, l. 2.

[232] Joint Ex. 31, Adv. Doc. No. 34-10; Joint Ex. 23, Adv. Doc. No. 33-23; Joint Ex. 29, Adv. Doc. No. 34-8.

[233] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 87, l. 1 – p. 89, l. 16; p. 147, l. 13 – p. 150, l. 6.

[234] Joint Ex. 37, Adv. Doc. No. 34-15, p. 31, l. 9 – p. 32, l. 7.

[235] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 149, l. 2 – p. 150, l. 10.

[236] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 96, ll. 4 – 11; Joint Ex. 37, Adv. Doc. No. 34-15, p. 50, ll. 17 – 23.

discrepancies on the financial statements he submitted to the IRS as part of the offer-in-compromise process.[237]

But the discrepancies on the Debtor's financial statements were nowhere near those in *Feshbach*. Recall, in *Feshbach*, the debtors reported having less than $10,000 in income on their financial statements when, in fact, their tax return reflected nearly $200,000 in income. Here, the Debtor's financial statement reflected $23,000/month in gross income in 2017—roughly $2,800 less than listed on his 2016 W-2 and tax returns.[238] So, at worst, the Debtor "understated" his income by roughly 11%.

As for the low offers in compromise, those were made on the advice of counsel with the understanding the initial offer and later counteroffer were intended to get the negotiation process going.[239] And, unlike in *Mitchell*, the Debtor's offers were not intended to be "take it or else" threats. To the contrary, the Debtor believed, based on the advice of his counsel, the low offers were a way to get his foot in the door with the IRS to negotiate a resolution of his tax debt.[240] Besides, the Eleventh Circuit, in *Feshbach*, explained that courts should not be too quick to characterize

---

[237] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 121, l. 7 – p. 126, l. 25.

[238] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 125, l. 18 – p. 126, l. 8.

[239] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 150, ll. 7 – 17.

[240] Trial Tr. Vol. I, Adv. Doc. No. 41, p. 150, ll. 7 – 17.

offers the IRS rejects as "too low" or otherwise unacceptable as having been made in "bad faith."[241]

Even accepting Mish's characterization regarding the Debtor's attentiveness (or lack thereof) to resolving his tax debt with the IRS, the IRS has not pointed to any evidence that the Debtor's lack of attentiveness was intended to delay collection, as was the case in *Feshbach*.[242] Thus, even though there were some bumps along the way in the Debtor's dealings with the IRS, the Court concludes the evidence as a whole shows the Debtor acted in good faith (or, at a minimum, did not act in bad faith) in his dealings with the IRS.

### 6.    The Debtor did not conceal (or fraudulently transfer) his assets.

In *Jacobs*, the record was replete with evidence of the debtor attempting to conceal his assets from the IRS. To begin, the debtor improperly characterized his earnings as non-wage income.[243] Moreover, the debtor and his wife bought a home and titled it in his wife's name even though the debtor made all the mortgage

---

[241] *Feshbach v. Dep't of Treasury (In re Feshbach)*, 974 F.3d 1320, 1328 – 29 (11th Cir. 2020) ("Approaching the IRS with an offer-in-compromise is not, by itself, an act to evade taxes or evidence of attempted evasion. That is true even if the IRS rejects the taxpayer's offer. The negotiation process is flexible, and taxpayers must have leeway to present good-faith offers, even if the IRS concludes that an offer is too low or otherwise not acceptable. If we are quick to interpret rejected offers-in-compromise as bad-faith attempts to evade, then we risk discouraging settlement.")

[242] *Id.* at 1332 (explaining that while "the Feshbachs contend that the bankruptcy court 'disregarded' the trial testimony of IRS officers that their offers were not dilatory," "there were also the contemporaneous notes of the IRS officers who believed the offers were intended to delay collection," which the bankruptcy judge credited).

[243] *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 26 (11th Cir. 2007).

payments.[244] And one of the couple's cars was titled in the wife's name, while another car was financed in the wife's name, even though the debtor's law firms made the payments for both cars.[245] Finally, the debtor and his law firms made more than $100,000 in undocumented "loans" to a jewelry store his wife owned only to later forgive those "loans."[246] In holding that the bankruptcy court clearly erred in determining that the debtor did not act willfully, the Eleventh Circuit pointed to (among other things) the improper characterization of the debtor's income and the undocumented loans to his wife's company, which the Eleventh Circuit concluded "strongly indicate[d] willfulness."[247]

In *Mitchell*, the Eleventh Circuit likewise relied on (among other things) the debtor's attempts to conceal assets when it held that "the bankruptcy court clearly erred when it concluded there was insufficient evidence to support a conclusion of willfulness."[248] There, the debtor and his wife bought a home (and financed it) in the wife's name even though she wasn't working and the debtor was the one who was going to be paying the mortgage.[249] The debtor in *Mitchell* testified it was a "no-brainer" to put the house in his wife's name because otherwise the IRS could levy on

---

[244] *Id.* at 925 – 26.

[245] *Id.* at 926.

[246] *Id.* at 917, 927.

[247] *Id.* at 927.

[248] *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1328 (11th Cir. 2011).

[249] *Id.*

it.[250] And when the IRS issued a notice of intent to levy on the debtor's wages, the debtor, who was a real estate agent, formed a real estate company in his wife's name (she was sole shareholder, officer, and director) and began depositing his commission checks into the new company's bank account. According to the Eleventh Circuit, it was "clear" the debtor knew the IRS could not touch his commissions if he put them into the new company's account.[251]

Here, unlike in *Jacobs* and *Mitchell*, there is no evidence the Debtor attempted to conceal assets. To be clear, as the Eleventh Circuit has explained more than once, "fraudulent intent is not required" to prove willfulness.[252] But, in finding evidence of willfulness in *Feshbach* and *Mitchell*, the Eleventh Circuit considered evidence that the debtors attempted to conceal assets. So, while not dispositive of the mental state

---

[250] *Id.*

[251] *Id.*

[252] *Id.* ("After a three day trial, the bankruptcy court found insufficient evidence to support a conclusion of willfulness as required by § 523(a)(1)(C). Specifically, the bankruptcy court found 'the case lacks the type of fraudulent behaviors—such as hidden assets or extravagant spending—that would support a finding of willfulness.' However, we have held that fraudulent intent is not required, and that all the Government must prove is that [the debtor] acted knowingly and deliberately.") (citations omitted); *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 924 – 25 (11th Cir. 2007) ("[T]he Bankruptcy Court appears to have required a showing of fraud or 'a fraudulent scheme' to satisfy the conduct requirement. Such a fraud analysis contravenes this Court's statement in *Fretz* that '[f]raudulent intent is not required' for § 523(a)(1)(C)'s mental state prong. The Bankruptcy Court therefore applied an incorrect legal standard for nondischargeability under § 523(a)(1)(C).") (citations omitted).

prong, the absence of similar evidence here is relevant when looking at the totality of the circumstances.[253]

## III.   Conclusion

There are two ways to view the evidence in this case: On the one hand, the Court could infer from the Debtor's high discretionary spending that the Debtor willfully attempted to evade his taxes. On the other hand, the Court could conclude that while the Debtor's spending was high, it was not necessarily excessive or lavish — and considering that there was no direct evidence of willfulness, the Debtor's initial failure to pay his taxes was the result of a mistake, the Debtor dealt with the IRS in good faith, and the Debtor did not attempt to conceal assets — the Debtor's failure to pay taxes was not willful.

It was the United States' job to convince the Court which of these two versions was the case. Although it was a close call, the Court concludes, after considering all the evidence—in particular, the Debtor's testimony, which the Court found credible—the United States failed to convince this Court by a preponderance of the evidence that the Debtor acted willfully.

The Court will enter a separate final judgment discharging the Debtor's tax liability.

---

[253] *Looft v. United States (In re Looft)*, 533 B.R. 910, 920 (Bankr. N.D. Ga. 2015) (Ellis-Monro, J.) (explaining that while the government need not prove fraudulent intent, "consideration of the badges of fraud may be relevant and helpful" in determining willfulness).

Attorney Jonathan Semach is directed to serve a copy of these Findings of Fact and Conclusions of Law on all interested parties who do not receive service by CM/ECF and to file a proof of service within three days of their entry.

**Buddy D. Ford, Esq.**
**Jonathan A. Semach, Esq.**
**Heather Reel, Esq.**
**Buddy D. Ford, P.A.**
  *Counsel for Debtor*

**David A. Hubbert, Esq.**
**Daniel B. Causey, IV, Esq.**
**Aaron C. Brownwell, Esq.**
**United States Department of Justice, Tax Division**
  *Counsel for Internal Revenue Service*